# United States Court of Appeals for the Federal Circuit

---

**THE ESTATE OF E. WAYNE HAGE AND THE ESTATE OF JEAN N. HAGE,**
*Plaintiffs-Cross Appellants,*

**v.**

**UNITED STATES,**
*Defendant-Appellant.*

---

2011-5001, -5013

---

Appeals from the United States Court of Federal Claims in case no. 91-CV-1470, Senior Judge Loren A. Smith.

---

Decided: July 26, 2012

---

LYMAN D. BEDFORD, Clausen Law Group, of Pt. Richmond, California, argued for plaintiffs-cross appellants. With him on the brief was MICHAEL J. VAN ZANDT, Hanson Bridget LLP, of San Francisco, California.

ELIZABETH ANN PETERSON, Environment and Natural Resources Division, Appellate Section, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With her on the brief was IGNACIA S. MORENO, Assistant Attorney General.

JOSEPH FELLER, Natural Resources Law Clinic, University of Colorado, of Boulder, Colorado, for amicus curiae, State of Nevada, Department of Wildlife, et al.

BRIAN T. HODGES, Pacific Legal Foundation, of Bellevue, Washington, for amicus curiae Pacific Legal Foundation. With him on the brief was JAMES S. BURLING, of Sacramento, California.

------

Before LOURIE, LINN, and MOORE, *Circuit Judges*.

MOORE, *Circuit Judge*.

E. Wayne Hage and Jean Hage brought an action against the United States, seeking compensation for a Fifth Amendment taking of private property, breach of contract, and range improvements pursuant to 43 U.S.C. § 1752(g). The Court of Federal Claims (Claims Court) awarded compensation for the taking of water rights plus interest from the date of the taking. The Claims Court also awarded compensation for range improvements, but did not award any corresponding pre-judgment interest. For the reasons set forth below, we *affirm-in-part*, *reverse-in-part*, *vacate-in-part*, and *remand* for proceedings consistent with this opinion.

## BACKGROUND

In 1978, E. Wayne Hage and Jean Hage acquired a ranching operation in Nevada that occupied approximately 7,000 acres of private land and used approximately 752,000 acres of adjoining federal lands under grazing permits from the Forest Service and the Bureau

of Land Management.[1]  The Hages' predecessors in interest to the land acquired water rights under Nevada state law in streams and ditches now located on federal lands. *See* Act of July 26, 1866 (43 U.S.C. § 661).

Shortly after the Hages acquired the ranching operation, disputes arose between the Hages and the government concerning the nature and scope of the Hages' water rights and grazing permits.  For example, the Hages objected to the Forest Service allowing the Nevada Department of Wildlife to release non-indigenous elk onto federal land for which the Hages had grazing permits on the ground that the elk reduced the available forage and water.  The introduction of the elk caused other problems as well, such as fence damage and scattering of the Hages' cattle on the allotments.

As early as 1978, the Forest Service observed unauthorized grazing by the Hages' cattle, and made several requests that the cattle be moved.  J.A. 569.  This continued for several years.  J.A. 570-73.  The Forest Service also notified the Hages of issues relating to fence maintenance pursuant to their grazing permits.  J.A. 1022.  In 1983, for example, the Hages received approximately forty letters and seventy visits from the Forest Service charging them with various violations related to their grazing permits. *Id.*

In June 1990, the Forest Service informed the Hages of a twenty percent suspension of permitted cattle on their Table Mountain allotment during the 1990 grazing season due to the Hages' lack of livestock control and excess use on the allotment after the permitted grazing

---

[1]    Although many of the interactions relating to the Hages' claims relate only to the Forest Service or Bureau of Land Management, we need not distinguish between them for the purposes of this appeal.

season in 1988. J.A. 1249-51. The Forest Service also notified the Hages that they were required to place a minimum number of cattle on the allotment, and notify the Forest Service prior to placing any cattle on the allotment. J.A. 1246-47. The Hages placed less than the minimum number of cattle on the allotment and failed to notify the Forest Service beforehand. J.A. 1248. The Forest Service notified the Hages of their non-compliance and ordered them to remove the cattle by September 21, 1990, which was after the end of the Hages' permitted season. *Id.* After requesting the Hages to "show cause" why a portion of the remaining permitted cattle should not be suspended due to the repeated violations, the Forest Service canceled some of the remaining permitted cattle rights for two years. J.A. 1249-52, 1254-55.

During the 1990 grazing season, the Forest Service also instructed the Hages to remove all of their permitted cattle from the Meadow Canyon allotment due to over-grazing. J.A. 301. Mr. Hage testified that it was impossible to keep the cattle off Meadow Canyon due to a twenty-five mile largely unfenced boundary between the surrounding land and the allotment. J.A. 1040-41. After an administrative appeal to stay this requirement was denied, Mr. Hage tried unsuccessfully to remove the cattle. J.A. 1042. Because of the continued violation, the Forest Service permanently canceled thirty-eight percent of the Hages' permitted cattle rights and suspended all grazing on the Meadow Canyon allotment for five years beginning with the 1991 grazing season. J.A. 373-88. After sending at least two notices of intent to impound cattle found on the Meadow Canyon allotment, J.A. 1256, 1265, the Forest Service eventually impounded the Hages' cattle, J.A. 1260-61, and later sold them, J.A. 367, after the Hages were unable to pay the costs of the impound-ment, J.A. 1045.

Disputes also arose between the Hages and the government concerning maintenance of the Hages' ditch rights of way on federal lands. Shortly after the Hages acquired the ranch, they became aware of the requirement to take out special use permits to perform ditch maintenance. J.A. 856-57. The Hages asked for and received special use permits until early 1986. J.A. 778, 805-08. The Hages, however, stopped applying for special use permits because they no longer believed they were necessary. J.A. 778, 857-58. Mr. Hage testified that a ranger informed him he no longer needed to apply for a special use permit, and that the Forest Service manual stated the same. J.A. 857, 1028. Even though the Forest Service continued to demand that the Hages apply for a special use permit, J.A. 1029, the Hages performed ditch maintenance without applying for any special use permits, J.A. 1029-30.

Around 1990, Mr. Hage hired a woodcutter to clear trees along a ditch right of way on federal land. J.A. 1030. The Forest Service sent Mr. Hage a letter notifying him that "damaging or removing natural features . . . and maintaining improvements without proper authorization are criminal acts, punishable by a up to a $5000 fine and/or 6 months imprisonment." J.A. 1281. The letter also reminded Mr. Hage that the Forest Service previously notified him of the special use requirement. *Id.* Mr. Hage was subsequently prosecuted and convicted for damaging and removing government property (the trees). *United States v. Seaman*, 18 F.3d 649 (9th Cir. 1994). The conviction, however, was overturned on the ground of inadequate proof of the value of the property damaged and removed. *Id.* at 651.

In 1991, the Hages filed suit against the United States alleging a Fifth Amendment taking of private property, a right to compensation for range improvements

pursuant to 43 U.S.C. § 1752(g), and breach of contract. After almost twenty years of litigation, including two trials and several opinions by the Claims Court, the court awarded the Hages compensation for 1) a regulatory taking of their water rights, 2) a physical taking of their water rights, and 3) range improvements under 43 U.S.C. § 1752(g). *Estate of Hage v. United States*, 82 Fed. Cl. 202 (2008) (*Hage V*). The court awarded pre-judgment interest for the takings claims, but did not award pre-judgment interest for the range improvements award. *Estate of Hage v. United States*, No. 91-1470L, slip op. at 5 (Fed. Cl. June 9, 2010). The government appeals each award, including the amount of just compensation awarded, and the Hages cross-appeal for pre-judgment interest on the range improvements award. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## DISCUSSION

Whether a compensable taking has occurred is a question of law based on factual underpinnings. *Cary v. United States*, 552 F.3d 1373, 1376 (Fed. Cir. 2009) (citing *Alves v. United States*, 133 F.3d 1454, 1456 (Fed. Cir. 1998)). We review the Claims Court's legal conclusions *de novo* and its fact findings for clear error. *Holland v. United States*, 621 F.3d 1366, 1374 (Fed. Cir. 2010). Whether the Claims Court has jurisdiction is a legal issue reviewed *de novo*. *W. Co. of N. Am. v. United States*, 323 F.3d 1024, 1029 (Fed. Cir. 2003). The Claims Court "does not have jurisdiction over claims that are not ripe." *Morris v. United States*, 392 F.3d 1372, 1375 (Fed. Cir. 2004) (citing *Howard W. Heck & Assocs., Inc. v. United States*, 134 F.3d 1468 (Fed. Cir. 1998)).

The Fifth Amendment provides that private property shall not be taken "for public use, without just compensation." U.S. Const. amend. V, cl.4. There are two kinds of

takings under the Fifth Amendment: physical takings and regulatory takings. *Washoe Cnty. v. United States*, 319 F.3d 1320, 1326 (Fed. Cir. 2003) (citing *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1014-15 (1992)). A physical taking generally occurs by "a direct government appropriation or physical invasion of private property." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005) (citations omitted). A regulatory taking may occur "when government actions do not encroach upon or occupy the property yet still affect and limit its use to such an extent that a taking occurs." *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001) (citing *Pa. Coal Co. v. Mahon*, 260 U.S. 393 (1922)). These two types of takings are subject to different analyses.

We employ a two-part test to determine whether governmental action constitutes a physical taking without just compensation: 1) we determine "whether the claimant has identified a cognizable Fifth Amendment property interest that is asserted to be the subject of the taking," and 2) if so, we determine "whether that property interest was 'taken.'" *Acceptance Ins. Cos. v. United States*, 583 F.3d 849, 854 (Fed. Cir. 2009) (citations omitted). "[W]e do not reach this second step without first identifying a cognizable property interest." *Air Pegasus of D.C., Inc. v. United States*, 424 F.3d 1206, 1213 (Fed. Cir. 2005).

Regulatory takings are generally evaluated using the multi-factor test from *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 124 (1978). The *Penn Central* test involves analyzing: (1) "[t]he economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the governmental action." *Id.*

A regulatory takings claim "is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186 (1985). A final decision is necessary because "[e]valuating whether the regulations effect a taking requires knowing to a reasonable degree of certainty what limitations the agency will, pursuant to regulations, place on the property." *Morris v. United States*, 392 F.3d 1372, 1376 (Fed. Cir. 2004) (citing *MacDonald, Sommer & Frates v. Yolo Cnty.*, 477 U.S. 340, 350-51 (1986)). Accordingly, "when an agency provides procedures for obtaining a final decision, a takings claim is unlikely to be ripe until the property owner complies with those procedures." *Id.* (citing *Greenbrier v. United States*, 193 F.3d 1348, 1359 (Fed. Cir. 1999)).

## I. Regulatory Taking

The Claims Court held there was a regulatory taking of the Hages' water rights when the Forest Service allowed vegetation to accumulate in streams and prevented the Hages from performing maintenance on the stream channels and ditch rights of way. *Hage V*, 82 Fed. Cl. at 211-13. The Claims Court recognized that rights of way that run over federal land may be subject to reasonable regulation, such as requiring special use permits to perform certain ditch maintenance. *Id.* at 212 (citing *Hage v. United States*, 51 Fed. Cl. 570, 584 (2002)). The court concluded, however, that the Hages did not have to apply for a permit since it would "clearly have been futile," and that "[b]ased on the history between the Forest Service and [the Hages], the special use permit requirement for ditch maintenance rises to the level of a prohibition, and is therefore a taking of their property rights." *Id.* at 213. The court also found that the Forest Service allowed the

Hages to use only hand tools for ditch maintenance and concluded that this "prevented all effective maintenance." *Id.* at 212-13.

The government argues that the Hages' regulatory takings claim is not ripe because the Hages failed to seek a special use permit to maintain their irrigation ditches. Appellant's Br. 32. The government notes that all of the Hages' prior applications were granted, and that the Hages deliberately decided not to apply for a permit, which led to Mr. Hage's prosecution. *Id.* The government argues that the futility exception does not apply since a plaintiff must previously have been denied a permit and there must be evidence that further requests would be treated similarly. Appellant's Reply Br. 9.

The Hages argue that it would have been futile to apply for a permit based on their contentious history with the Forest Service. Cross-Appellants' Br. 22. The Hages note that the government did not present evidence that a permit would have been granted, or that one was even necessary to maintain an 1866 Act ditch that preexisted the Forest Service. *Id.* They also argue that there is no requirement to seek permission for construction and maintenance of 1866 Act ditches because those rights are "specifically reserved." *Id.* at 29 (citing 43 U.S.C. § 661). Under Nevada law, according to the Hages, an appropriator of water has the "absolute right" to go onto another's land to clear obstructions in the natural channel that interferes with the water. *Id.* at 30. The Hages also argue that the hand tool requirement prevented all effective ditch maintenance. *Id.* at 22.

We hold that the Claims Court erred in holding that the Hages' regulatory takings claim was ripe. While the Hages claim that it would have been futile to apply for a special use permit based on their history with the Forest

Service, the majority of the evidence showing disputes between the Hages and the Forest Service related to the Hages' *grazing* permits. The Hages fail to explain how disputes concerning their grazing permits would lead the Forest Service to deny them special use permits to maintain their irrigation ditches. In fact, these disputes did not prevent the Forest Service from granting the Hages' applications for special use permits. The grazing disputes began in 1978 and continued through the 1990s, *see, e.g.*, J.A. 569-73, 1246-51, but the Forest Service still granted *every special use permit* for which the Hages applied, *see* J.A. 778, 805-08, 856-57. There is no evidence that these disputes would lead the Forest Service to deny special use permits after 1986 (when the Hages unilaterally decided to stop applying). There is also no evidence that suggests the Hages stopped applying for special use permits because they expected that the Forest Service would deny the permits. Instead, Mr. Hage explained that he stopped applying for special use permits because he no longer believed they were necessary. J.A. 857-58.

Nor does the record support the Hages' contention that disputes regarding ditch maintenance would lead the Forest Service to deny them permits. The only evidence of a dispute concerning ditch maintenance is the letter threatening prosecution of Mr. Hage and the actual prosecution of Mr. Hage. This, however, was a result of Mr. Hage's failure to apply for a special use permit. The letter, for example, states that "maintaining improvements *without proper authorization*" is a criminal act, punishable by fine and/or imprisonment. J.A. 1281 (emphasis added). Although Mr. Hage's conviction was overturned, it was on the basis of inadequate proof of the value of the trees damaged and removed and not because a special use permit was unnecessary. *Seaman*, 18 F.3d at 651. There is no evidence suggesting that the disputes

between the Forest Service and the Hages would cause the Forest Service to deny the Hages special use permits to perform ditch maintenance.

We also reject the Hages' contention that the Forest Service limited ditch maintenance to hand tools even with a special use permit, and that as a result, an application for a special use permit to maintain their ditches with heavy equipment would have been futile. Cross-Appellants' Br. 22; Oral Argument at 14:40-14:50, *Estate of Hage v. United States*, No. 2011-5001, -5013 (Fed. Cir. Apr. 3, 2012), *available at* http://oralarguments.cafc.uscourts.gov/default.aspx?fl=2011-5001.mp3. The record shows that the ditches cannot be maintained effectively using only hand tools, *see, e.g.*, J.A. 985-86, but does not support the Hages' claim that the Forest Service limited ditch maintenance to only hand tools even with a special use permit.

The Hages cite testimony from Mr. Hage describing a conversation with Bob Mason, a Forest Service employee, shortly after he began ditch maintenance in 1978. J.A. 1027; *see also* J.A. 734. Mr. Mason, according to Mr. Hage, explained that a special use permit was required to perform any ditch maintenance. J.A. 1028.

The record supports the government's position that the hand tools requirement only applied in the absence of a special use permit. Until 1986, the Hages obtained special use permits to perform ditch maintenance, which as the Hages explain, could not be accomplished with hand tools. *See* Cross-Appellants' Br. 22-23. If the special use permits were limited to only hand tools, however, the Hages could not have performed ditch maintenance. The record does not explain this inconsistency and does not otherwise support holding that the special use permits limited maintenance to hand tools.

We therefore conclude that the Claims Court erred in holding that applying for a special use permit would have been futile. To the extent the Hages argue that the mere existence of a requirement for a special use permit constitutes a regulatory taking, we disagree. The government may regulate private property; it is only when a regulation "goes too far [that] it will be recognized as a taking." *Lingle*, 544 U.S. at 537 (quoting *Pa. Coal Co.*, 260 U.S. at 415).

## II. Physical Taking

The Hages allege a physical taking of their water rights based on the construction of fences around water sources on federal lands in which they held grazing permits. The Hages' water rights were acquired under Nevada state law, which defines the scope of such rights. *See* 43 U.S.C. § 661. In Nevada, "water of all sources of water supply within the boundaries of the State whether above or beneath the surface of the ground, belongs to the public." Nev. Rev. Stat. § 533.025. Those that hold water rights "do not own or acquire title to water," but "merely enjoy the right to beneficial use." *Desert Irrigation, Ltd. v. Nevada*, 944 P.2d 835, 842 (Nev. 1997) (citing Nev. Rev. Stat. § 533.030). Beneficial use is "the basis, the measure and the limit of the right to the use of water." Nev. Rev. Stat. § 533.035. A water rights holder has no rights to the water beyond what he can put to beneficial use. Therefore, to establish their Fifth Amendment takings claim, the Hages had to prove, *inter alia*, that any water taken could have been put to beneficial use.

The Claims Court held that the construction of fences around certain springs and streams on federal lands amounted to a physical taking of the Hages' water rights during the time period the Hages had grazing permits. *Hage V*, 82 Fed. Cl. at 211. The court reasoned that the

construction of fences physically prevented the Hages' cattle from accessing the water during the time in which cattle were still permitted to graze on the allotments. *Id.* The cattle, according to the court, "had the right to water at these streams." *Id.* Although the record indicates that the government constructed fences in 1981-1982, J.A. 1019-20, and again in 1988-1990, J.A. 1153, the court's opinion does not specify which fences constituted a physical taking. The court did, however, limit this takings claim to the time period when the Hages "still had a grazing permit." *Hage V*, 82 Fed. Cl. at 211.

The government argues that the Hages' physical takings claim relating to the fences constructed in 1981-1982 is time barred because the action allegedly giving rise to a taking occurred more than six years before the complaint was filed. Appellant's Br. 46-47. The government notes that the Hages challenged the government's authority to construct the fences at that time, but that the fences remained. *Id.* at 46 (citing J.A. 1020). The government argues that the fences erected in 1988-1990 could not support a takings award because Mr. Hage testified that they did not exclude cattle from the water sources. *Id.* at 47 n.17 (citing J.A. 1021). The government also argues that "a water right has no 'access' component," and that Congress's recognition of state-law water rights on federal lands "does not include recognition of an 'appurtenant' right to use and occupy federal rangelands for access to the water." *Id.* at 49-50 (citing *Colvin Cattle v. United States*, 468 F.3d 803, 808 (Fed. Cir. 2006)). The government further argues that the Hages failed to prove that they could have put the water allegedly appropriated by the government to beneficial use. *Id.* at 53.

The Hages argue that their claim is not time-barred because fences were erected in 1988-1990, which is within the six-year statute of limitations period. Cross-

Appellants' Br. 40. The Hages contend that there is "ample evidence" in the record to support the court's determination that a physical taking occurred. *Id.* at 41. The Hages claim that "[t]he fact that some of this water may have seeped out beyond the boundaries of the fences is irrelevant." *Id.* The Hages argue that a physical taking occurred when the government erected fences that excluded their cattle from the water sources. *Id.* The Hages admit that the fences erected in 1988-1990 did not prevent access to the water after the elk tore the fences down, but argue that a taking still occurred during the period of time the fences remained. Oral Argument at 21:47-22:25, *Hage*, No. 2011-5001, -5013.

As an initial matter, we agree with the government that any claim based on the fences erected in 1981-1982 is barred by the six-year statute of limitations period, 28 U.S.C. § 2501, because this suit was filed in 1991. We disagree, however, that *Colvin Cattle* means that there is no "access" component to the Hages' water rights. In *Colvin Cattle*, we held that the cancellation of grazing permits on federal land did not amount to a taking of the plaintiff's stockwater rights, because its Nevada "water rights do not have an attendant right to graze." 468 F.3d at 808. We expressly noted, however, that "the government has not impeded its access to water." *Id.* at 806. *Colvin Cattle* thus stands for the proposition that water rights do not include an attendant right to graze, *id.* at 808, but it does not follow that the government may prevent all access to such water rights.

We agree with the Hages that the government could not prevent them from accessing water to which they owned rights without just compensation. The government, for example, could not entirely fence off a water source, such as a lake, and prevent a water rights holder from accessing such water. Assuming the other criteria

for a Fifth Amendment taking were met, such fencing could be a taking. The Hages' claim, however, is flawed because there is no evidence that the government actually took water that they could have put to beneficial use. For example, the Hages do not allege or point to evidence that the fences prevented the water from reaching their land. Likewise, the Hages do not allege that there was insufficient water for their cattle on the allotments or that they could have put more water to use. Because there is no evidence that the government's actions resulted in taking the Hages' water rights, the Claims Court erred in holding that the construction of fences amounted to a physical taking.

### III. Range Improvements – 43 U.S.C. § 1752(g)

The Hages claim they should receive compensation for range improvements because of the government's actions. By statute, a permittee shall receive "reasonable compensation for the adjusted value, *to be determined by the Secretary concerned*, of his interest in authorized permanent improvements placed or constructed by the permittee" on land covered by a grazing permit when the grazing permit is canceled to devote the lands covered by the permit to another public purpose. 43 U.S.C. § 1752(g) (emphasis added). A claim for compensation under § 1752(g) is not ripe unless a claimant requests a determination by the Secretary of the value of its improvements "as required by the statute." *Colvin Cattle*, 468 F.3d at 809.

The Claims Court awarded the Hages compensation for several range improvements on federal lands pursuant to § 1752(g). *Hage V*, 82 Fed. Cl. at 216. The court acknowledged that the Hages did not request a determination by the Secretary concerned of the value of their improvements, but nonetheless awarded compensation.

The court held that the Hages could pursue their claim because there was "no clear procedure" for how they could seek compensation. *Id.* at 214. The court also noted that withholding consideration would impose upon the Hages "the hardship of attempting to determine how they would seek compensation in an appropriate agency" and that their claim would "likely be futile" in light of their history with the Forest Service. *Id.* at 214.

We addressed this issue in *Colvin Cattle*, in which we held that when a claimant "d[oes] not request a determination by the Secretary of the value of its improvements as required by the statute . . . its claim is not ripe for failure to exhaust administrative remedies." 468 F.3d at 809 (citing *Julius Goldman's Egg City v. United States*, 556 F.2d 1096, 1099 (Ct. Cl. 1977)). As in *Colvin Cattle*, the Hages did not request a determination by the Secretary of the value of their improvements. The Hages fault the government for not presenting evidence of procedures to seek such a determination, but the Hages bear the burden of establishing jurisdiction, not the government. *See Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed. Cir. 1998). While the Hages' path to obtaining an agency action was ill-defined, the alleged "hardship of attempting to determine how [the Hages] would seek compensation in an appropriate agency," *Hage V*, 82 Fed. Cl. at 214, alone is insufficient to render the Hages' claim ripe. The Hages do not argue that they attempted to seek a determination by the Secretary, and without doing so, the Hages' claim for range improvements pursuant to § 1752(g) "is not ripe for failure to exhaust administrative remedies." *See Colvin Cattle*, 468 F.3d at 809. We thus hold that the Claims Court erred in awarding the Hages compensation for range improvements under § 1752(g) because the Hages' claim is not ripe.

IV. Pre-Judgment Interest on Range Improvements

The Hages cross-appeal seeking pre-judgment interest on the award for range improvements. Although we hold that the Hages are not entitled to compensation for range improvements under 43 U.S.C. § 1752(g), that does not end our inquiry because the Hages' cross-appeal alleges a Fifth Amendment taking. To establish a Fifth Amendment taking, a claimant must identify a cognizable property interest. *Acceptance Ins. Cos.*, 583 F.3d at 854. If the claimant fails to do so, we need not reach the issue of whether any property interest was taken. *Air Pegasus of D.C.*, 424 F.3d at 1213.

The Hages argue that the facts establish that they constructed range improvements, both on their own land and on the allotments for which they held grazing permits. Cross-Appellants' Br. 62. These improvements include wells, pipelines, fences, and roads. *Id.* at 63. The Hages argue that they own the range improvements because they spent considerable time, effort, and financial resources building them. *Id.* at 62-67. The Hages also cite a 2009 decision by the Bureau of Land Management (BLM), which directed the Hages to remove range improvement projects performed under the permits. Cross-Appellants' Reply Br. 11 (citing J.A. 1456-57).

The mere fact that the Hages constructed and maintained range improvements on federal land does not establish that they own a cognizable property interest in such improvements. The Claims Court noted that the grazing permits stated that "permanent improvements constructed, or existing for use, in conjunction with this permit are the property of the United States Government, unless specifically designated otherwise, or covered by a cooperative agreement." *Hage v. United States*, 35 Fed. Cl. 147, 179 (Fed. Cl. 1996). The Hages failed to show any

agreements establishing an ownership interest in the range improvements. Although BLM directed "[t]he removal of the range improvement projects under each Range Improvement Permit," J.A. 1456, it does not follow that the Hages owned a cognizable property interest in range improvements absent any such designation. With regards to cooperative agreements, the BLM decision specifically stated, "Title to the range improvement projects authorized by these Cooperative Agreements is held by the United States as set forth in the applicable regulations and terms contained in these agreements." J.A. 1458. The decision simply gave the Hages 180 days "to salvage all materials owned by the [Hage] Estate." J.A. 1456.

It is the Hages' burden to establish cognizable property interests for the purposes of their takings claims. *Klamath Irrigation Dist. v. United States*, 635 F.3d 505, 519 n.12 (Fed. Cir. 2011) (citing *Air Pegasus of D.C.*, 424 F.3d at 1212-13). The Hages have not met their burden because the evidence demonstrates only that they constructed or maintained the improvements on the federal lands, not that they owned title to those improvements. To the contrary, the evidence of record demonstrates that the improvements were the property of the United States government. Without evidence of ownership, the Hages cannot establish a cognizable property interest. To the extent that the Hages argue that they are entitled to a diminution in value for range improvements on their private property stemming from the cancelation of their permits, this argument is without merit. *See Colvin Cattle*, 468 F.3d at 808 ("That the ranch may have lost value by virtue of losing the grazing lease is of no moment because such loss in value has not occurred by virtue of governmental restrictions on a constitutionally cognizable property interest.") (citing *United States v. Fuller*, 409

U.S. 488, 493 (1973)). We thus affirm the denial of pre-judgment interest for range improvements.

CONCLUSION

The Hages' regulatory takings claim and claim for compensation pursuant to 43 U.S.C. § 1752(g) are not ripe, and we therefore vacate the Claims Court's award of damages. To the extent the Hages' claim for a physical taking relies on fences constructed in 1981-1982, this claim is untimely. To the extent the physical takings claim relies on fences constructed in 1988-1990, we reverse because there is no evidence that water was taken that the Hages could have put to beneficial use. Finally, we affirm the Claims Court's holding that the Hages are not entitled to pre-judgment interest for any range improvements award because the Hages failed to identify a cognizable property interest. We remand for further proceedings consistent with this opinion.

**AFFIRMED-IN-PART, REVERSED-IN-PART, VACATED-IN-PART, and REMANDED**

COSTS

No costs.