# United States Court of Appeals for the Federal Circuit

---

**JERRY MCGUIRE,**
*Plaintiff-Appellant,*

**v.**

**UNITED STATES,**
*Defendant-Appellee.*

---

2012-5073

---

Appeal from the United States Court of Federal Claims in No. 09-CV-380, Senior Judge Bohdan A. Futey.

---

Decided: February 20, 2013

---

DAVID A. DOMINA, Domina Law Group PC, LLC, of Omaha, Nebraska, argued for plaintiff-appellant.

THEKLA HANSEN-YOUNG, Environment & Natural Resources Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. Of counsel on the brief was IGNACIA S. MORENO, Assistant Attorney General.

---

Before DYK, PROST, and REYNA, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* DYK.

*Circuit Judge* REYNA concurs in the judgment.

DYK, *Circuit Judge.*

Jerry McGuire leased a plot of farmland in Arizona from the Colorado River Indian Tribes ("CRIT") with the approval of the Bureau of Indian Affairs ("BIA"). He filed this Fifth Amendment regulatory takings claim after the BIA removed a bridge that he used to access portions of the leased property. McGuire does not claim that removal of the bridge was itself a taking, but rather that the BIA's alleged refusal to authorize replacement of the bridge was a taking of his property rights. After trial the Court of Federal Claims (the "Claims Court") denied McGuire's regulatory takings claim. McGuire appeals. Because we hold that McGuire's regulatory takings claim never ripened and that, even if McGuire's claim had ripened, he had no cognizable property interest, we affirm.

## BACKGROUND

On January 1, 1995, McGuire signed a ten-year lease with CRIT for a parcel of farmland in Parker, Arizona in order to raise alfalfa. The lease was approved on behalf of the BIA by Allen Anspach, superintendent of the BIA's Colorado River Agency, because the United States held the land in trust for CRIT. A BIA canal (Lateral 19-R) divided the leased property into two sections of approximately equal size.

Three bridges enabled farmers such as McGuire to cross the canal. Two bridges were not on McGuire's leased property, and McGuire claimed no property interest relating to those bridges. These were the Tenth Avenue bridge, which was slightly southwest of the property; and the FFA bridge, which was slightly northeast of the property. The third bridge was involved in the claimed

regulatory taking. This was the Eighth Avenue Bridge. It was located between the northern and southern halves of the leased property. It was not located on the leased property, but inside a right-of-way owned by the BIA. Though it is not known who constructed the bridge or when it was built, the bridge had been in existence since at least the 1960's or 1970's.

Approximately three years into the lease, in 1998, the BIA became concerned that the Eighth Avenue Bridge was unsafe, and the BIA informed McGuire that the bridge would be removed. McGuire in turn informed CRIT (the lessor of his property) that the BIA intended to remove the bridge, and CRIT wrote to Anspach on December 9 and December 23, 1998 "requesting [that] removal of the bridge be delayed" and noting that "removal of th[e] bridge would place a hardship on Mr. McGuire." J.A. PX 18; PX 20. Anspach responded on December 24, 1998, noting that the Eighth Avenue Bridge "was not built or authorized by the [BIA], . . . was put in at an undetermined time without any construction specifications or without [BIA] approval . . . [i]n direct violation of 25 CFR 171.9 [which requires a permit to build such structures]," and posed "a potential hazard to anyone that uses it." J.A. PX 20. The letter indicated that "[the BIA] will remove this bridge during dry up 2000." *Id*. It reasoned that "[t]his w[ould] give [McGuire] time to comply with 25 CFR 171.9," a regulation that, as will be described in more detail below, required an application for a permit to build a new bridge that encroached on the BIA right-of-way over the canal. *Id*.

Soon thereafter, the BIA formally notified McGuire of the impending bridge closure and removal and of his duty to apply for a permit to replace the bridge. On February 5, 1999, Anspach wrote McGuire to "inform [him] of [the BIA's] intent to remove the unsafe and unauthorized wooden bridge across canal 19R which runs to [his] leased lands." J.A. PX 21. The letter stated that the bridge would

be closed during dry up 2000 and, referencing 25 C.F.R. § 171.9, advised McGuire that "[i]f [he] should decide that [he] need[s] to bridge the canal in order to operate [his] farm [he] may submit to . . . Agency Superintendent [Anspach] plans, with specifications, for a new bridge and apply for a crossing permit." *Id.* Anspach sent McGuire a similar letter on August 25, 1999, explaining that it "remain[ed] [the BIA's] intent" to remove the bridge while reiterating that McGuire would need "to submit the required documentation" under 25 C.F.R. § 171.9. J.A. PX 22.

Rather than apply for a permit under § 171.9, McGuire filed suit against the BIA in tribal court on October 12, 1999, where he alleged breach of contract and condemnation claims; specifically, he alleged that the BIA failed to abide by certain requirements under § 171.9 (that it failed to issue permits and supply proper forms); and that the BIA "cut-off reasonable ingress and egress to over half of the leased premises in violation of section 17" of the lease. J.A. PX 23, Compl. ¶ 11. McGuire further alleged that "the demand made by the [BIA] would require that a new bridge be installed at [McGuire's] expense," and that this would constitute a breach of the lease. *Id.* ¶ 12-13. There is no record of any judgment issued by the tribal court.

Around the same time McGuire pursued his claim in tribal court, McGuire also engaged in correspondence with the BIA regarding possible replacement of the bridge. Specifically, McGuire discussed a replacement bridge with both Jeffrey Hinkins (Supervisory General Engineer) and Ted Henry (Irrigation Systems Manager). During these conversations, McGuire may have produced an informal handwritten sketch of a proposed bridge design, but copies of these plans apparently no longer exist. McGuire testified that these conversations, which occurred in the "summer to late summer" of 1999, J.A. 141, were sufficient to apply for a permit under § 171.9 to build a new

bridge. The BIA deemed these efforts insufficient, as Anspach again wrote McGuire on November 12, 1999, stating that "[w]e again encourage you to apply for a permit to replace the current structure with one that meets our design and safety requirements," referencing 25 C.F.R. § 171.9. J.A. PX 24. The BIA barricaded the bridge in November 1999 and removed it in January 2000.

McGuire, after attempting to farm the property for several months without access to the Eighth Avenue Bridge, refused to make his January 2000 lease payment to CRIT. Eventually the lease was cancelled by CRIT because of McGuire's failure to make lease payments. A new tenant, William Alcaida, began leasing the property in January 2001. Alcaida submitted a written request to the BIA for a permit to replace the bridge which detailed the design and materials for the bridge. After the submission was revised to provide additional information, Alcaida's application was deemed sufficient by the BIA. Alcaida received a permit to replace the Eighth Avenue Bridge in January 2002, and built a replacement bridge immediately thereafter.

After McGuire's lease was cancelled, McGuire began to pursue his remedies in federal court, filing for Chapter 11 bankruptcy relief in the District Court for the District of Arizona on June 15, 2001. This initiated a complex procedural history. On November 13, 2001, as part of the bankruptcy proceeding, McGuire brought his takings (inverse condemnation) claim against the government. The government moved to dismiss the case for lack of subject matter jurisdiction (on the ground that such a claim belonged in the Claims Court), but the district court held that jurisdiction was proper. The bankruptcy court then conducted a trial on April 14 and 15, 2005, and the court recommended that McGuire be awarded $1,132,059.60 as compensation for a regulatory taking of the Eighth Avenue Bridge. The district court rejected the bankruptcy court's recommendation on April 5, 2006,

holding that McGuire's claim never ripened because "McGuire never availed himself of t[he] permit process" under 25 C.F.R. § 171.9(c) and that "[t]he fact that the permit process was nebulous d[id] not amount to a denial of a permit." *See McGuire v. United States*, No. 05-CV-2694, slip. op. at 11 & n.7 (D. Ariz. Apr. 5, 2006).

McGuire then appealed to the Ninth Circuit, which held that jurisdiction had been improper in both the district court and the bankruptcy court. *See McGuire v. United States*, 550 F.3d 903, 910 (9th Cir. 2008). Because McGuire's takings claim fell within the scope of the Tucker Act (and was a claim for over $10,000), jurisdiction was proper only in the Claims Court. *Id.* at 911. Therefore, the Ninth Circuit transferred the case to the Claims Court pursuant to 28 U.S.C. § 1631. *Id.* at 914.

Despite determining that it lacked jurisdiction, the Ninth Circuit chose to reach the ripeness issue as a matter of "judicial economy and courtesy" to the Claims Court. *McGuire*, 550 F.3d at 910 n.3. On this issue, it disagreed with the district court, noting that "the BIA did not follow a formal permitting process." *Id.* at 909. In the Ninth Circuit's view, McGuire complied with the prevailing BIA permitting practice by "discuss[ing] the bridge removal and plans for a new bridge several times with Henry and Hinkins" during 1999, and drawing "a sketch of a design for a new bridge with Hinkins." *Id.* In the Ninth Circuit's view, McGuire "did everything reasonably within his power . . . to build a new [bridge]," and his takings claim was therefore ripe. *Id.*

The Claims Court received the transferred case on June 10, 2009. *See McGuire v. United States*, 97 Fed. Cl. 425, 428 (2011). McGuire continued to assert that he had a property interest that gave him the right to replace the

bridge.[1] The government again moved both to dismiss for lack of ripeness and moved for summary judgment on the takings claim on the ground that McGuire lacked a cognizable property interest. *See id.* On ripeness, the Claims Court noted that it may have "reach[ed] a different decision" on the ripeness question if it had been "called on to look at [the] issue anew," but it held "that the decision of the Ninth Circuit is the law of the case" and that, under *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800 (1988), there were not "extraordinary circumstances" that justified disturbing the Ninth Circuit's ripeness determination. *McGuire*, 97 Fed. Cl. at 435-37. With respect to the summary judgment motion, the Claims Court held that no categorical taking occurred, but that genuine issues of material fact precluded summary judgment on McGuire's regulatory takings claim. *Id.* at 443.

The Claims Court held a bench trial from September 13 to 15, 2011. After trial, the Claims Court reaffirmed that the case was ripe for adjudication because the Ninth Circuit's decision on ripeness was the law of the case. *See McGuire v. United States*, No. 09-380L, 2012 WL 569359, at *5-6 (Fed. Cl. Feb. 22, 2012). On the regulatory takings issue, the court held that McGuire failed to establish that he had a compensable property interest in the Eighth Avenue Bridge, thus defeating any takings claim. *Id.* at *14. McGuire timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

---

[1]    He has also asserted a right to repair the bridge but never sought from the BIA authority to repair the bridge and, as the Claims Court concluded, the BIA regulations appear not to deal with the issue of repair. *See McGuire v. United States*, No. 09-380L, 2012 WL 569359, at *12 (Fed. Cl. Feb. 22, 2012) (noting that "[t]he applicable regulations do not mention even once a right to repair crossings like the Eighth Avenue Bridge").

DISCUSSION

We review the Claims Court's determination with respect to ripeness de novo. *See Morris v. United States*, 392 F.3d 1372, 1375 (Fed. Cir. 2004) (citing *Heck & Assocs. v. United States*, 134 F.3d 1468, 1471 (Fed. Cir. 1998)). The issue of whether McGuire held a compensable property interest is also a "purely legal question" that we review de novo. *Tex. State Bank v. United States*, 423 F.3d 1370, 1378 (Fed. Cir. 2005) (citing *Webb's Fabulous Pharm., Inc. v. Beckwith*, 449 U.S. 155, 161 (1980)).

I

We turn first to ripeness, which is a "threshold consideration[]" that we must resolve before addressing the merits. *Palazzolo v. Rhode Island*, 533 U.S. 606, 618 (2001).

A

Initially we must determine whether we are bound by the Ninth Circuit's ripeness decision. As noted above, the Ninth Circuit addressed ripeness in its opinion as a matter of "courtesy" to the Claims Court. We conclude that we are not bound by the Ninth Circuit's ripeness decision because the Ninth Circuit lacked authority to decide the question, which was a prudential inquiry not necessary to the transfer decision.

The transfer statute, 28 U.S.C. § 1631, authorizes courts, upon finding a "want of jurisdiction," to transfer cases to a court where the action "could have been brought." The legislative history of the statute clarifies that § 1631 "authorize[s] the court in which a case is improperly filed to transfer it to a court where subject matter jurisdiction is proper." *See* S. Rep. No. 97-275, at 30 (1981). The underlying purpose of the statute is to enable courts to transfer a case to an appropriate forum if the case has been brought in the wrong jurisdiction. Thus, in *Christianson*, the Supreme Court determined that

jurisdiction in the Federal Circuit was improper (and that jurisdiction in the Seventh Circuit was proper) where Christianson's antitrust claims did not arise under the patent laws. *See* 486 U.S. at 809-10. In that case, the "litigants [were] bandied back and forth helplessly between two courts, each of which insist[ed] the other has jurisdiction." *Id.* at 818. The Court emphasized that "[t]he courts of appeals should . . . adher[e] strictly to principles of law of the case" in making jurisdictional determinations under 28 U.S.C. § 1631, so as to "encourage . . . quick settlement of questions of transfer." *Id.* at 819. This would "obviate the necessity for [the Supreme Court] to resolve" future comparative jurisdictional disputes. *Id.*

There is no question here that the Central District of California, and hence the Ninth Circuit, lacked jurisdiction over this case because it involved a monetary claim against the government within the exclusive jurisdiction of the Claims Court. While McGuire had previously agreed that the Ninth Circuit did not need to decide the ripeness question before transfer, he now argues that § 1631 requires that the transferee court was a court in which the "case could have been brought." Under Ninth Circuit authority transfer requires a determination that the transferee court would have jurisdiction. *See Hose v. I.N.S.*, 180 F.3d 992, 996 (9th Cir. 1999). Because ripeness, in McGuire's view, is a jurisdictional question, the Ninth Circuit was correct to decide that question before transfer.

Even accepting arguendo the Ninth Circuit's view that a determination must be made as to the transferee court's jurisdiction, McGuire's problem is that ripeness in the exhaustion context is not a jurisdictional question.[2]

---

[2]    The government urges that the statute's reference to "could have been brought" refers only to comparative jurisdiction, i.e., whether Congress allocated jurisdiction

The Supreme Court has made clear that many inquiries, while labeled "jurisdictional," are actually not jurisdictional inquiries. *See, e.g., Union Pac. R. R. Co. v. Bhd. of Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment, Cent. Region*, 130 S. Ct. 584, 596 (2009) (noting that the word jurisdiction has been used to convey "too many" meanings). Accordingly, the Court has clarified that "the term 'jurisdictional' properly applies only to 'prescriptions delineating the classes of cases (subject-matter jurisdiction) and the persons (personal jurisdiction) falling within a court's adjudicatory authority.'" *Kontrick v. Ryan*, 540 U.S. 443, 455 (2004); *see also Reed Elsevier, Inc. v. Muchnick*, 130 S.Ct. 1237, 1243 (2010). And "[o]ther rules, even if important and mandatory, . . . should not be given the jurisdictional brand." *Henderson ex rel. Henderson v. Shinseki*, 131 S. Ct. 1197, 1203 (2011).

Here, the ripeness inquiry engaged in by the Ninth Circuit was not a jurisdictional inquiry. The ripeness inquiry concerns whether McGuire ripened his regulatory takings claim by exhausting his administrative remedies. The Court has held that the exhaustion requirement of Title VII (requiring complainants to file a timely charge of discrimination with the Equal Employment Opportunity Commission (EEOC) before proceeding to court) is nonjurisdictional. *See Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982). In *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 734 (1997), the Court similarly concluded that exhaustion requirements associated with "regulatory takings claim[s]" are "prudential hurdles," not jurisdictional ones.[3] The Ninth Circuit itself stated here

over the particular type of case to the transferor or transferee court. We need not decide that question here.

[3]    In *Suitum*, the Court also noted that the government "d[id] not question that Suitum properly present[ed] a genuine 'case or controversy' sufficient to satisfy Article

that it decided ripeness as a "courtesy" and that the ripeness issue was "arguably prudential, rather than jurisdictional." *McGuire*, 550 F.3d at 910 n.3.

Because the ripeness inquiry here was purely prudential, it was not necessary or appropriate for the Ninth Circuit to decide the ripeness question and its ruling is not entitled to "law of the case" treatment under *Christianson*. To be sure, the Supreme Court stated in *Christianson* that the law of the case doctrine "applies as much to the decisions of a coordinate court in the same case as to a court's own decisions." 486 U.S. at 816 (citing *Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc.*, 761 F.2d 649, 657 (Fed. Cir. 1985); *Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 900-01 (Fed. Cir. 1984)). But as the cases cited by the Supreme Court demonstrate, the Court was referring to a situation in which the transferring court had made merits rulings before it lost jurisdiction. The cases involved a unique situation where future appeals in patent cases went to the Federal Circuit, and the question was whether the Federal Circuit was bound by the earlier regional circuit rulings, rendered when the regional circuit had jurisdiction. Here, the Ninth Circuit never had jurisdiction.

As our predecessor court determined, "when a suit is dismissed for lack of jurisdiction, rulings on the merits rendered prior to the dismissal are nullities, void *ab initio*," and such rulings "are entitled to no weight . . . as

---

III, but maintain[ed] only that Suitum's action fail[ed] to satisfy [the Court's] prudential ripeness requirements." 520 U.S. at 733 n.7. We have occasionally characterized the ripeness issue as jurisdictional. *See, e.g., Morris v. United States*, 392 F.3d 1372, 1374 (Fed. Cir. 2004); *Simmons Oil Corp. v. Testoro Petroleum Corp.*, 86 F.3d 1138, 1141 (Fed. Cir. 1996). But all of those cases either predated *Suitum* or referred to pre-*Suitum* cases for the proposition without discussing *Suitum*.

law of the case." *Hydaburg Coop Ass'n v. United States*, 667 F.2d 64, 66 (Ct. Cl. 1981); *see also Christopher Vill., L.P. v. United States*, 360 F.3d 1319 (Fed. Cir. 2004) (when a court acts beyond its jurisdiction by intruding in the exclusive jurisdiction of the Claims Court, its judgment is void). Thus, we are not bound to follow the Ninth Circuit's ripeness determination.

## B

Because we are not bound by the Ninth Circuit's ripeness determination, we next consider whether the takings claim is ripe. As the Supreme Court has held:

> [T]he very existence of a permit system implies that permission may be granted, leaving the landowner free to use the property as desired. . . . Only when a permit is denied and the effect of the denial is to prevent "economically viable" use of the land in question can it be said that a taking has occurred.

*United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 127 (1985). Thus, the Supreme Court has established that a property-holder must obtain "a final decision regarding how it will be allowed to develop its property" before pursuing a regulatory takings claim. *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 190 (1985). This is necessary because the relevant inquiry under *Penn Central Transportation Company v. New York City*, 438 U.S. 104 (1978), requires the court to evaluate "the economic impact of the challenged action and the extent to which it interferes with reasonable investment-backed expectations," factors which "simply cannot be evaluated until the administrative agency has arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question." *Williamson*, 473 U.S. at 191; *see also MacDonald, Sommer, & Frates v. Yolo Cnty.*, 477 U.S. 340, 348 (1986) ("A court cannot determine whether a regulation

has gone 'too far' unless it knows how far the regulation goes."). There is no dispute that "when an agency provides procedures for obtaining a final decision, a takings claim is unlikely to be ripe until the property owner complies with those procedures." *Morris*, 392 F.3d at 1376. We consider whether there was such a permitting process and, if so, whether McGuire exhausted his administrative remedies by filing a permit application and securing a final decision on his permit application.

As to the first question, there was a permitting process available to McGuire that would have enabled him to replace the bridge. The relevant regulation, 25 C.F.R. § 171.9(c), provided:

> [S]tructures crossing or encroaching on project canal . . . rights-of-way which are needed for private use may be constructed privately *in accordance with plans approved* by the Officer-in-Charge or by the project. . . . Such structures will be constructed and maintained under *revocable permits on proper forms* . . . .

§ 171.9(c) (emphases added). The permitting process here was informal rather than formal. Although the government never provided McGuire with a written form listing the requirements of a written submission, a permitting process existed. McGuire was referred to the process of § 171.9 on numerous occasions, and he was told to submit written plans with specifications. Thus the process, albeit informal, required something in writing from McGuire.

The informal nature of the procedures does not allow McGuire to escape the exhaustion requirement. In *Estate of Hage v. United States*, 687 F.3d 1281, 1290 (Fed. Cir. 2012), we held that a claim for compensation under 43 U.S.C. § 1752(g) (a statute allowing for "reasonable compensation" for cancelled grazing permits) was not ripe despite the fact that there was "'no clear procedure' for how [the plaintiffs] could seek compensation" under the

statute. *Hage*, 687 F.3d at 1290. There, the plaintiffs had failed to "request a determination by the Secretary [of the Interior] of the value of [certain] improvements" as required by the statute. *Id.* Notwithstanding the lack of clear procedures, the court held that the Hages, not the government, had the burden of demonstrating ripeness, and by failing to request a determination had not done so. *See id.* at 1291. McGuire, similarly, has such a burden, notwithstanding the ambiguous and informal nature of the permitting process contemplated by the regulation.

Because an informal permitting process existed, we next address whether McGuire availed himself of that process and exhausted his administrative remedies. As noted above, the regulations required the submission of plans, which the BIA reasonably interpreted to require a written submission.

McGuire, however, never submitted a written permit application or plans to reconstruct the bridge. The subsequent lessor, in contrast, submitted a written application to replace the Eighth Avenue Bridge, and the BIA issued a final decision allowing him to build a new bridge over the canal based on that application. McGuire's claim fails on account of ripeness on this basis alone.

McGuire contends that his informal meetings, oral communications with Hinkins, and written sketch were sufficient to constitute a permit application, and that the BIA led him to believe that he had complied with the permit application requirement.

McGuire testified that he thought he had submitted a permit application in the "summer to late summer" of 1999. J.A. 141. He contends that he drew a sketch of a bridge design in Hinkins' presence and discussed his plans. Based on the sketch and conversations, McGuire "th[ought] that [the BIA] had what they needed." J.A. 147. He believed that:

> Mr. Anspach in his letter [of August 25, 1999] said to take it up with Mr. Hinkins. We looked at a bridge design. [Hinkins] said he ran the calculations on the pipe sizes and it should be sufficient for the flow that that canal needs and he would talk to Mr. Anspach.

J.A. 147. Hinkins, however, disagreed with McGuire's characterization. Hinkins testified that, "[o]ther than maybe writing something in my office somewhere on a piece of paper, [there were] no written communication[s]." J.A. 181. Hinkins specifically stated that a permit requires "sufficient information for us to be able to generate a permit for the construction or placement of some kind of structure within our irrigation project." J.A. 182. He stated that, "at a minimum, we need some kind of an idea of the materials that are going to be used, and how they are going to be used, and where they are going to be used." J.A. 182. Hinkins testified that "[there was] nothing that [Hinkins] would deem as sufficient to go forth and issue a permit on." J.A. 182.

McGuire admitted that when he met with Mr. Hinkins, Hinkins neither granted nor denied McGuire permission to build the bridge. Moreover, McGuire never testified that the deciding official (Anspach) had ever agreed that sufficient information had been provided. And McGuire did not claim that final action was taken. Indeed, the November 12, 1999, letter made clear that McGuire's claimed submission had not been adequate; and that the BIA had reached no final decision.[4] The

---

[4]     The November 12, 1999 letter stated that "[t]his decision is being made to limit the liability of the United States and to protect the public and is final for the Department of Interior," J.A. PX 24, but the final decision referred to was the decision to close the bridge for safety reasons, not any decision on an alleged permit application to replace the bridge. This was conceded by McGuire's

November 12, 1999, letter from Anspach stated that "[w]e again encourage you to apply for a permit," J.A. PX 24, making clear that the agency believed at that point that an application had not yet been submitted. McGuire admitted that he failed to submit a written plan thereafter, conceding that he did not submit "any other plans to the BIA in writing after receipt of th[e] November 1999 letter." J.A. 141; *see also McGuire*, 2012 WL 569359, at *6 (noting that McGuire "never submitted any documentation to the BIA after receiving [the November 1999] letter").

"Where further administrative process could reasonably result in a more definite statement of the impact of the regulation, the property owner is generally required to pursue that avenue of relief before bringing a takings claim." *Morris*, 392 F.3d at 1376. The only exception to the *Morris* rule occurs "in the limited circumstance in which the administrative entity has no discretion regarding the regulation's applicability and its only option is enforcement." *Greenbrier v. United States*, 193 F.3d 1348, 1359 (Fed. Cir. 1999).[5] That was not the case here: the BIA had continued discretion to review, evaluate, and approve a proper application, as it did with McGuire's successor.

McGuire has also not proven futility with respect to his administrative efforts. The futility exception to the "final decision rule" only "excuse[s] a property owner from submitting 'multiple applications when the manner in which the first application was rejected makes it clear that no project will be approved.'" *Wyatt v. United States*,

_____

counsel at oral argument, who admitted that the letter was not referring to a final action on a permit application.

[5]    Similarly, we held in *Heck v. United States*, 134 F.3d 1468, 1472 (Fed. Cir. 1998), that "dismissal of [an] application as incomplete was not a final decision or a decision on the merits."

271 F.3d 1090, 1097 (Fed. Cir. 2001) (quoting *Heck*, 134 F.3d at 1472). The November 12, 1999, letter made clear that McGuire could submit an application to the BIA, and he did not do so. To the extent that the letter implied that any application that had been submitted was incomplete, this only reiterated that McGuire needed to do more to exhaust his remedies. Additionally, there was no "constructive denial" here resulting from "extraordinary delay," as McGuire also asserts.

In sum, McGuire had a burden to pursue the available administrative remedies, and to secure a final decision from the agency. He failed to do so. McGuire's claim thus fails for lack of ripeness.

II

Even if McGuire's regulatory takings claim had ripened, it fails on the merits. We apply a two-part test in assessing regulatory takings claims. *See Acceptance Ins. Cos. v. United States*, 583 F.3d 849, 854 (Fed. Cir. 2009). First, "the court determines whether the claimant has identified a cognizable Fifth Amendment property interest that is asserted to be the subject of the taking." *Id.* Second, "if the court concludes that a cognizable property interest exists, it determines whether that property interest was 'taken,'" applying the well-known *Penn Central* test. *Id.* We conclude that the Claims Court did not err in concluding that McGuire lacks the necessary property interest. *See Skip Kirchdorfer, Inc. v. United States*, 6 F.3d 1573, 1580 (Fed. Cir. 1993) (noting that the "plaintiff must show a legally-cognizable property interest").

In assessing whether McGuire has the requisite property interest, we must look for "'crucial indicia of a property right,' such as the ability to sell, assign, transfer, or exclude." *Hearts Bluff Game Ranch, Inc. v. United States*, 669 F.3d 1326, 1330 (Fed. Cir. 2012) (quoting *Conti v. United States*, 291 F.3d 1334, 1342 (Fed. Cir. 2002)).

Here, McGuire presents several theories as to why he had a cognizable property interest. He argues that he had a property interest because (1) the CRIT lease provided him with access rights to the bridge; (2) BIA regulations conferred rights allowing him to replace the bridge; (3) he had an easement by necessity in the bridge; and (4) his investment-backed expectations created a property interest in accessing the bridge.[6] Insofar as McGuire complains that he had a property right in accessing the bridge, his claim is not that removal of the bridge itself was a taking, but rather that the removal of the bridge gave rise to a right to replace it. For example, he admitted that his

---

[6] Though McGuire's brief in places seems to argue that McGuire owned the bridge, such an argument is waived as the only property interests that McGuire asserted in the Claims Court were unrelated to ownership. *See McGuire*, 2012 WL 569359, at *7. McGuire submitted no evidence that he owned the bridge. Although Rodney McVey, acting superintendent of the BIA, may have told McGuire that the bridge was McGuire's, *see id.* at *8, we recently made clear that "relying on representations by [a government agency] . . . does not create a compensable property interest," *Hearts Bluff*, 669 F.3d at 1332.

Additionally, though McGuire argues that ownership of the bridge defaulted to him because neither the BIA nor CRIT purported to own the bridge, the BIA never disclaimed ownership of the bridge. The letter that McGuire cites to suggest that the BIA disclaimed ownership of the bridge merely states that the bridge was located "on irrigation canal rights-of-ways." J.A. PX 20. Notably McGuire did not assert a physical takings claim with respect to the bridge. *See McGuire*, 97 Fed. Cl. at 437 n.27 (noting that although McGuire had briefly argued a physical takings claim in oral argument in front of the Claims Court, the issue was never briefed and discussion of the issue was therefore "unnecessary").

claim was that the "BIA could [have] order[ed] [the bridge] taken out for safety reasons, but this gave rise to a right to replace the structure. BIA thwarted McGuire's replacement efforts." Appellant's Br. 11. He also described his claim as that "the right to rebuild . . . w[as] taken," and admitted that "he does not contend he was entitled to keep an unsafe bridge in place." Appellant's Br. 28.

## A

McGuire contends that paragraphs 9, 10, and 17 of the lease provide him with a property rights to replace the bridge. The lease does not mention the Eighth Avenue Bridge. The provisions on which McGuire relies reference "improvements." Paragraph 9, entitled "improvements," indicates that improvements are "*attached* [to the leased property]" and that these improvements "shall at the option of LESSOR, remain on said premises after the termination of this Lease and thereupon become the property of LESSOR." J.A. PX 01 ¶ 9 (emphasis added). Paragraph 10 notes that "LESSEE shall, at all times during the term of this Lease and at LESSEE'S sole cost and expense, maintain the premises and all improvements thereon and . . . repair [those improvements]. . . ." [7] J.A. PX 01 ¶ 10. McGuire asserts that these lease provisions gave him a property interest with respect to the bridge. McGuire, however, has not demonstrated that the bridge was an improvement that was "attached" to the leased property. As the Claims Court noted, "McGuire [did] not present[] any evidence to show that CRIT [the lessor] possessed the bridge, which was located 'inside the 19-R Canal, and *inside the BIA right of way.*'" *McGuire,* 2012 WL 569359, at *9 (quoting J.A. 163) (emphasis added).

---

[7]    McGuire's brief misidentifies paragraph 10 as paragraph 11.

McGuire also argues that Paragraph 17 of the lease conveys a property interest allowing him to access the bridge. Paragraph 17 states that McGuire "shall, at all reasonable times, be allowed ingress and egress to the leased premises over existing roadways *under the possession and control of LESSOR.*" J.A. PX 01 ¶ 17 (emphasis added). But the lessor, again, was CRIT, and CRIT neither "possessed" nor "controlled" the bridge because the bridge was inside the BIA right-of-way.

B

McGuire also argues that several regulations, such as 25 C.F.R. §§ 162, 169, and 171 (1999), gave him a cognizable property interest in replacing the bridge. McGuire first cites 25 C.F.R. § 162.9 (1999), which states that "[i]mprovements placed *on the leased land* shall become the property of the lessor [CRIT] unless specifically excepted therefrom under the terms of the lease." *Id.* (emphasis added). This is no different from Paragraph 9 of the lease (discussed above), which merely indicates that ownership of improvements attached to the property defaulted to the lessor (CRIT). McGuire has not shown that the bridge was an improvement on his leased property.

McGuire also argues that he had a right to apply for a permit to replace the bridge under other regulations, including § 171.9. Section 171.9 concerns only the right to apply for a "revocable permit." The other regulations similarly allow revocation of any rights granted by the government. *See* 25 C.F.R. § 169.13 (1999) ("applicant for a right of way"); *id.* §§ 169.18, 169.5 (noting that rights of way are granted only where "individual applications" for such rights of way are filed with the BIA). The right to apply for a revocable permit is not in and of itself a property interest. Indeed, even such a permit is not a property

interest.[8] *See Hearts Bluff*, 669 F.3d at 1331 (noting that where a property interest "would not exist without . . . enabling government regulations" requiring permits, "discretionary denial [of such permits] cannot be a cognizable property interest"); *Am. Pelagic Fishing Co. v. United States*, 379 F.3d 1363, 1380 (Fed. Cir. 2004) (holding that there was no cognizable property right in fishing where fishing rights were subject to revocable permits and therefore "a matter of governmental permission, rather than a property right"); *Mitchell Arms, Inc. v. United States*, 7 F.3d 212, 217 (Fed. Cir. 1993) (holding that expectations arising from revoked import permits did not constitute a cognizable property right).

## C

McGuire also argues that he is entitled to an easement by necessity in the Eighth Avenue Bridge. Our case in *Palmyra Pacific Seafoods L.L.C. v. United States*, 561 F.3d 1361 (Fed. Cir. 2009) governs this issue. Though an easement by necessity "has been recognized as a compensable property interest," *id.* at 1370, no such easement existed here. *Palmyra* noted that "a regulation that *prevents* a property owner from accessing private property would implicate a cognizable property interest for purposes of the Fifth Amendment." *Id.* at 1371 (emphasis added). Thus, all means of access to the property must be cut off by the regulation to warrant a cognizable easement of necessity. *See Laney v. United States*, 661 F.2d 145, 149 (Ct. Cl. 1981) ("[I]f his access to his block on all four sides is cut off, that is a taking, and if authorized is compensable under the just compensation clause.").

---

[8]    McGuire points out that, in *Hearts Bluff*, we emphasized that when a landowner has a property interest, denial of a revocable permit can be a taking. *See* 669 F.3d at 1329. McGuire, however, has not shown the existence of a property interest.

In *Palmyra*, the court determined that there was not a regulatory taking because "[t]here [wa]s nothing in the regulation that by its terms restrict[ed] the plaintiffs' right to cross [a] refuge to reach their base of operation on [an] island." 561 F.3d at 1371. Here, much like *Palmyra*, the removal of the bridge did not restrict McGuire's ability to access the northern half of his property, as shown by the fact that he farmed on the property for several months after the bridge had been barricaded. *See McGuire*, 2012 WL 569359, at *12. He could access his property by both the Tenth Avenue Bridge and the FFA Bridge, both of which were owned by CRIT and were open to the public. "The new tenant farmed the northern portion of the Leased Property during 2001 using the FFA Bridge, the Tenth Avenue Bridge, and the Levee Road." Appellee's Br. 12. The Claims Court determined that "McGuire could still access his property from the north via Levee Road, or from either side by driving along the canal banks." *McGuire*, 2012 WL 569359, at *12. We do not find clear error in these factual findings.[9] It was only because McGuire did not find production without the Eighth Avenue Bridge to be economically viable that he abandoned his lease and filed his complaint, not because he was physically cut off from accessing the property.

D

Finally, McGuire suggests that his expectations that he would be able to continue to use the bridge somehow created a property interest. But "hopes and expectations of future property use are not in and of themselves a

---

[9] McGuire argues that use of these roads constituted an illegal trespass, but McGuire's use of these roads for several months belies that claim, given that these roads were on the BIA right-of-way, the BIA was aware of these alternative routes, and the BIA allowed and expected McGuire to use them.

cognizable property interest." *Hearts Bluff*, 669 F.3d at 1332.

* * *

Because McGuire cannot establish that he had a cognizable property interest in the use of the Eighth Avenue Bridge, his regulatory takings claim fails. *See Conti*, 291 F.3d at 1339 ("[I]f a claimant fails to demonstrate that the interest allegedly taken constituted a property interest under the Fifth Amendment, a court need not even consider whether the government regulation was a taking under the analysis set forth in *Penn Central*.").

CONCLUSION

McGuire has failed to demonstrate that his suit is ripe for adjudication. Even assuming that McGuire's claim is ripe, McGuire has failed to demonstrate that he had a cognizable property interest that would support a regulatory takings claim.

**AFFIRMED**

COSTS

No costs.

# United States Court of Appeals
## for the Federal Circuit

---

**JERRY MCGUIRE,**
*Plaintiff-Appellant,*

v.

**UNITED STATES,**
*Defendant-Appellee.*

---

2012-5073

---

Appeal from the United States Court of Federal Claims in case no. 09-CV-380, Senior Judge Bohdan A. Futey.

---

DAVID A. DOMINA, Domina Law Group PC, LLC, of Omaha, Nebraska, argued for plaintiff-appellant.

THEKLA HANSEN-YOUNG, Environment & Natural Resources Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. Of counsel on the brief was IGNACIA S. MORENO, Assistant Attorney General.

---

REYNA, *Circuit Judge*, concurring.

I agree with the majority that Mr. McGuire has not demonstrated that he had a cognizable property interest to support his takings claim, and that the Court of Federal Claims' judgment should be affirmed. I write separate-

ly to express my disagreement with the majority's decision to disregard the Ninth Circuit's holding that this case was ripe on the grounds that "it was not necessary or appropriate for the Ninth Circuit to decide the ripeness question." Majority Op. at 11.

"[T]he doctrine [of the law of the case] posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case. This rule of practice promotes the finality and efficiency of the judicial process by protecting against the agitation of settled issues." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815-16 (1988) (internal citations and quotation marks omitted). The doctrine applies to decisions of coordinate courts, *id.* at 816, and, despite the duty of a court to satisfy itself of its jurisdiction, the doctrine applies even to jurisdictional decisions. *See, e.g., Texas Am. Oil Corp. v. U.S. Dep't of Energy*, 44 F.3d 1557, 1561-62 (Fed. Cir. 1995) (applying a "plausibility" framework to find that the Fifth Circuit's jurisdictional ruling was the law of the case*); Doko Farms v. United States*, 861 F.2d 255, 256-57 (Fed. Cir. 1988) (declining to examine jurisdiction again when the question was close and the Fifth Circuit's decision was "plausible").

At least with respect to coordinate or subordinate courts, however, the doctrine of the law of the case does not limit a court's power. *Christianson*, 486 U.S. at 817. To the contrary: "A court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance, although as a rule courts should be loathe to do so in the absence of extraordinary circumstances . . . ." *Id.* (quoting *Arizona v. California*, 460 U.S. 605, 618 n.8 (1983)). Thus, the doctrine should apply except "when the case for departure is exceptionally clear, either because the controlling law has changed or the earlier decision is clearly erroneous and would lead to manifest injustice."

*See Mendenhall v. Barber-Greene Co.*, 26 F.3d 1573, 1582 (Fed. Cir. 1994).

In *Christianson*, the Supreme Court examined the law of the case doctrine in the context of 28 U.S.C. § 1631, the transfer statute. *See* 486 U.S. at 815-23. There, a plaintiff had appealed his antitrust claims to the Federal Circuit. *Id.* at 806. Because the antitrust claims did not arise under patent law, this court concluded that it was without jurisdiction and transferred the case to the Seventh Circuit. *See id.* The Seventh Circuit, reaching the opposite conclusion, transferred the case back to the Federal Circuit. *Id.* at 807. This court again concluded that it was without jurisdiction but, in the "interest of justice," decided the case on the merits. *Id.*

The Supreme Court granted certiorari and vacated our decision. The Court concluded that although the antitrust claims involved patents, they did not arise under patent law, and jurisdiction did not lie in the Federal Circuit. *See id.* at 811-13. Colt attempted to evade this result by arguing that the Federal Circuit was prohibited from revisiting the Seventh Circuit's jurisdiction decision because that decision was the law of the case. *See id.* at 815. The Court rejected this argument for three reasons. First, the Federal Circuit was the first court to decide the issue of jurisdiction, making its decision the law of the case. *Id.* at 817. Second, even if the Seventh Circuit's decision had been the law of the case, the Federal Circuit had not exceeded its authority by revisiting the issue once it determined that the Seventh Circuit's decision was clearly wrong. *Id.* Finally, of course, the Supreme Court itself was not bound by the jurisdictional decisions of either circuit. *Id.*

This case differs only slightly from *Christianson*. As in *Christianson*, we must decide whether a coordinate court's decision to transfer is the law of the case. Unlike *Christianson*, however, the decision to transfer is not

itself in dispute. Instead, the issue is whether we are bound by the Ninth Circuit's decision that this case was ripe. The majority views this question as unrelated to the decision to transfer, and concludes that it is not the law of the case. I disagree.

When a court concludes that it is without jurisdiction in a civil action, section 1631 requires that the court "shall, if it is in the interest of justice, transfer such action or appeal to any other such court in which the action or appeal could have been brought." As the majority correctly observes, the issue of ripeness in this case is a prudential consideration. *See Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 734 (1997). It was therefore not necessary to the determination of whether the district court or the Ninth Circuit had jurisdiction. But whether jurisdiction exists is only the first part of the inquiry under § 1631.

"The statute confers on [a court] the authority to make a single decision upon concluding that it lacks jurisdiction—whether to dismiss the case or, 'in the interest of justice,' to transfer it." *Christianson*, 486 U.S. at 818 (quoting 28 U.S.C. § 1631). Once the Ninth Circuit concluded that the district court lacked jurisdiction over the takings claim, it squarely confronted that question. The court stated that it addressed ripeness because it "consider[ed] it a predicate to transferring the case to the Court of Federal Claims" and because ripeness was the basis for the district court's judgment below. *McGuire v. United States*, 550 F.3d 903, 910 n.3 (9th Cir. 2008). The court believed it "would be inappropriate to transfer a case that [it] did not consider ripe." *Id.* Because it concluded that the case was ripe, it elected to transfer the case rather than to dismiss it. *Id.* at 914-15.

The majority is therefore incorrect that "the Ninth Circuit lacked authority to decide" the ripeness question. Majority Op. at 8. Once the court concluded that jurisdic-

tion was appropriate in the Court of Federal Claims, not the district court, ripeness—at least as it related to "the interest of justice" in transferring the case—was the only issue the Ninth Circuit had authority to address. The Ninth Circuit's conclusion that the case was ripe therefore became the law of the case, and the Court of Federal Claims, as well as this Court, was free to disregard it only if, under the framework elucidated in *Christianson*, it determined that that conclusion is clearly erroneous.

The majority errs in failing to apply that framework here. Nevertheless, by deciding that the case in fact was not ripe, the majority implicitly decides that the Ninth Circuit's conclusion was clearly erroneous. I disagree with this implicit conclusion. In any event, the majority correctly concludes that McGuire's claim must fail due to his lack of a cognizable property interest. This alone is dispositive and requires this court to affirm, and I therefore concur in the judgment.