# United States Court of Appeals
# for the Federal Circuit

———————————

**HUGH MARTIN, SANDRA KNOX-MARTIN, KIRKLAND JONES, THERON MALOY, SHERILYN MALOY,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

———————————

2017-2224

———————————

Appeal from the United States Court of Federal Claims in No. 1:16-cv-01159-PEC, Judge Patricia E. Campbell-Smith.

———————————

Decided: July 11, 2018

———————————

A. BLAIR DUNN, Western Agriculture, Resource and Business Advocates, LLP, Albuquerque, NM, argued for plaintiffs-appellants. Also represented by DORI ELLEN RICHARDS; MARSHALL RAY, Law Offices of Marshall J. Ray, LLC, Albuquerque, NM.

ERIKA KRANZ, Environment and Natural Resources Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented

by JEFFREY WOOD, ERIC GRANT, ELIZABETH ANN
PETERSON.

————————————

Before O'MALLEY, MAYER, and REYNA, *Circuit Judges.*

MAYER, *Circuit Judge.*

Hugh Martin, Sandra Knox-Martin, Kirkland Jones,
Theron Maloy, and Sherilyn Maloy (collectively, "the
Inholders") appeal the judgment of the United States
Court of Federal Claims dismissing their claim alleging a
Fifth Amendment taking as unripe. *See Martin v. United
States*, 131 Fed. Cl. 648 (2017) ("*Federal Claims Deci-
sion*"). We affirm.

## BACKGROUND

The Inholders own patented mining and homestead
claims inside the boundaries of the Santa Fe National
Forest. *See id.* at 650. In 2011, the Las Conchas Fire
caused widespread destruction of vegetation within the
forest. J.A. 66. Forest Roads 89 and 268, the roads which
the Inholders historically had used to access their inheld
properties, were severely damaged by flooding that oc-
curred in the wake of the fire. J.A. 33, 66.

In September 2011, the United States Forest Service
("Forest Service") notified the Inholders that "significant
flooding events" had rendered Forest Roads 89 and 268
"impassible." J.A. 66. Acknowledging that the Inholders
and other private landowners might wish to reach their
inheld properties, the Forest Service stated that it would
provide them with some "limited access" that would entail
"a combination of driving and hiking over specific routes
and under specific weather conditions." J.A. 66. In April
2012, the Forest Service sent the Inholders a letter in-
forming them "of the results of an assessment of roads
affected by . . . [the] devastating Las Conchas Fire." J.A.
86. The agency stated that "due to the magnitude of

damage by the fire and subsequent flooding, public safety would be highly threatened by use of [Forest Roads 89 and 268]." J.A. 86. It further stated that it had decided to "close these two roads to public access for the foreseeable future," explaining that because of the continuing instability of the terrain within Bland and Cochiti Canyons "[a]ny road reconstruction improvements made in the next few years [would] likely be destroyed by future flooding." J.A. 86. According to the agency, moreover, "even if reconstructing these roads were a viable option," it could not justify "expend[ing] public funds rebuilding roads for which there is no general public need." J.A. 86.

Although the Forest Service determined that Forest Roads 89 and 268 would "not be open to the public," it stated that it would "continue to work with" the Inholders and other private property owners to ensure that they had "adequate and reasonable access" to their inheld properties. J.A. 86. The Forest Service suggested that the Inholders work "collectively" with their "neighbors" to reconstruct the damaged roads, and stated that it would be willing to "facilitate the creation of a formal road association, which would then be granted a recordable private road easement." J.A. 86. The agency identified "two options" for establishing vehicular access to the Inholders' properties: (1) "[a] new (reconstructed) road over [the] existing alignment"; or (2) "[a] new road over a new alignment." J.A. 86.

The Inholders, through counsel, subsequently sent a letter to the United States Department of Agriculture ("USDA"), asserting that they held statutorily-granted easements over Forest Roads 89 and 268 and that they intended "to utilize and repair" those roads "in the very near future." J.A. 34 (internal quotation marks omitted). The USDA responded by informing the Inholders that it did "not agree" that they held any statutorily-granted easements, asserting that under the Act of July 26, 1866, ch. 262, § 8, 14 stat. 251, 253 (codified at 43 U.S.C. § 932)

("Revised Statute 2477"), *repealed by* Federal Land Policy and Management Act of 1976, Pub. L. No. 94-579, § 706(a), 90 Stat. 2743, 2793 ("FLPMA"), private citizens were not granted any "title interest in public roads." J.A. 34. Although the agency acknowledged that the Inholders had a right to access their inheld properties, it stated that this right was "subject to reasonable regulations." J.A. 34. It further stated that the "Inholders must comply with the rules and regulations applicable to ingress and egress across national forest system lands" and "that anyone using national forest lands in an unauthorized manner may be subject to criminal and civil penalties under federal law." J.A. 34. The USDA advised the Inholders to "work with the Forest Service to reconstruct road access." J.A. 34.

The Inholders then filed suit in the Court of Federal Claims, asserting that the Forest Service had effected a compensable taking of their "statutorily vested real property right-of-way easements." J.A. 5. They alleged that the Forest Service had "refus[ed] to recognize" their easements and had "deprived [them] of all meaningful access to their private property" by requiring them "to follow prohibitively expensive procedures in order to obtain special use permits" for road reconstruction. J.A. 5. According to the Inholders, the government had "physically seized [their] real property interest[s] under threat of civil and criminal prosecution." J.A. 6.

On May 19, 2017, the Court of Federal Claims granted the government's motion to dismiss the Inholders' complaint for lack of jurisdiction. *See Federal Claims Decision*, 131 Fed. Cl. at 651–53. The court determined that the Inholders had not adequately pled a physical takings claim, noting that they had not alleged facts suggesting that the government, "or any third party, ha[d] physically occupied the property at issue." *Id.* at 652. In the court's view, moreover, any claim for a regulatory taking was not ripe for review because the Inholders had

not yet applied for a permit to reconstruct Forest Roads 89 and 268. *Id.* at 652–53. The court stated that it did not need to determine whether the Inholders possess "a vested property right in the easements they allege are coextensive with [Forest Roads 89 and 268]," because even assuming that they hold such a property right, "a claim for a regulatory taking is not ripe until a permit is both sought and denied." *Id.* at 653.

The Inholders then appealed to this court. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

DISCUSSION

A. Standard of Review

We review *de novo* a determination that a takings claim is not ripe for review. *See McGuire v. United States*, 707 F.3d 1351, 1357 (Fed. Cir. 2013); *Morris v. United States*, 392 F.3d 1372, 1375 (Fed. Cir. 2004). The Court of Federal Claims is without jurisdiction to consider takings claims that are not ripe. *Estate of Hage v. United States*, 687 F.3d 1281, 1285 (Fed. Cir. 2012); *Morris*, 392 F.3d at 1375.

B. Fifth Amendment Takings

The Takings Clause of the Fifth Amendment provides that "private property" may not "be taken for public use, without just compensation." U.S. CONST. amend. V. "The principle reflected in the Clause goes back at least 800 years to Magna Carta." *Horne v. USDA*, – U.S. –, 135 S. Ct. 2419, 2426 (2015). Prior to *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922) ("*Pennsylvania Coal*"), the general view was that the Takings Clause extended only to the "direct appropriation of property, or the functional equivalent of a practical ouster of the owner's possession, like the permanent flooding of property." *Murr v. Wisconsin*, – U.S. –, 137 S. Ct. 1933, 1942 (2017) (citations and internal quotation marks omitted); *see United States v. Gen. Motors Corp.*, 323 U.S. 373, 375–79 (1945) (conclud-

ing that the government's occupation of a private warehouse effected a taking). In *Pennsylvania Coal*, however, the Supreme Court clarified that the Takings Clause also covered so-called "regulatory takings," stating that "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." 260 U.S. at 415. Specifically, "with certain qualifications . . . a regulation which denies all economically beneficial or productive use of land will require compensation under the Takings Clause." *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001) (citations and internal quotation marks omitted). Furthermore, "[w]here a regulation places limitations on land that fall short of eliminating all economically beneficial use, a taking nonetheless may have occurred, depending on a complex of factors including the regulation's economic effect on the landowner, the extent to which the regulation interferes with reasonable investment-backed expectations, and the character of the government action." *Id.*

In addition, a viable takings claim can arise in the "special context of land-use exactions." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538 (2005). Such claims typically involve situations in which a governmental body demands that an applicant surrender a portion of his or her property as a condition of obtaining a land-use permit. *See, e.g.*, *Dolan v. City of Tigard*, 512 U.S. 374, 378–92 (1994); *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 827–32 (1987). To "protect[] against the misuse of the power of land-use regulation," *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 599 (2013), the Supreme Court has determined that a unit of government may "condition approval of a permit on the dedication of property to the public" only if "there is a nexus and rough proportionality between the property that the government demands and the social costs of the applicant's proposal," *id.* at 605–06 (citations and internal quotation marks omitted); *see Dolan*, 512 U.S. at 391.

## C. Revised Statute 2477

Revised Statute 2477, which stated that "the right of way for the construction of highways over public lands, not reserved for public uses, is hereby granted," 43 U.S.C. § 932, has spawned some of the "more contentious land use issues in the West." *S. Utah Wilderness Alliance v. Bureau of Land Mgmt.*, 425 F.3d 735, 740 (10th Cir. 2005) ("*SUWA*"); *see also Wilderness Soc'y v. Kane Cty.*, 581 F.3d 1198, 1205 (10th Cir. 2009), *vacated on other grounds*, 632 F.3d 1162 (10th Cir. 2011) (en banc) (noting that "[t]here are thousands of miles of claimed [Revised Statute] 2477 rights of way across federal lands in the western United States"). Rights of way created under the statute "were an integral part of the congressional pro-development lands policy" and could be established with "no administrative formalities: no entry, no application, no license, no patent, and no deed on the federal side." *SUWA*, 425 F.3d at 741. The statute remained in effect from 1866 to 1976, when it was repealed by the FLPMA, § 706(a), 90 Stat. at 2793, and "most of the transportation routes of the West were established under its authority," *SUWA*, 425 F.3d at 740.

The Inholders assert that they hold Revised Statute 2477 "vested private easements for ingress and egress" to their patented mining and homestead claims within the Santa Fe National Forest. They contend that their vested easements run along Forest Roads 89 and 268 and "exist in addition to the public easements vested in the [S]tate of New Mexico and Sandoval County." According to the Inholders, the Court of Federal Claims erred in dismissing their takings claim as unripe. They complain that "the United States . . . has chosen to treat [Forest Roads 89 and 268] as its sole property," and has prohibited them from repairing those roads unless they "take on the enormous costs" of obtaining a special use permit. They further assert that "the United States has already taken [their] property without just compensation" by requiring

them to "surrender" their vested Revised Statute 2477 easements in exchange for a permit that would enable them to repair Forest Roads 89 and 268 and "allow them the full historical use of their patented mining properties."

The government disagrees. It contends that the Inholders do not hold valid Revised Statute 2477 easements, asserting that while the statute "authorized rights-of-way for the construction of *public* roads across unreserved federal lands," it "did not confer any property rights on *private parties*." In the government's view, moreover, even assuming that the Inholders have "a cognizable private property interest in [easements] along [Forest Roads 89 and 268]," any such easements "would still be subject to reasonable Forest Service regulations." According to the government, the Inholders' "claim of a regulatory taking due to the imposition of a special-use authorization requirement is not ripe for judicial review" because they have not yet applied for a special use permit that would allow them to engage in road reconstruction and repair.

## D. The Alleged Regulatory Taking

"We turn first to ripeness, which is a 'threshold consideration[]' that we must resolve before addressing the merits." *McGuire*, 707 F.3d at 1357 (quoting *Palazzolo*, 533 U.S. at 6180) (alteration in original). The ripeness doctrine is designed "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977); *see Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003). A claim for relief is not ripe for judicial review when it rests upon "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S.

568, 580–81 (1985) (citations and internal quotation marks omitted).

Even assuming *arguendo* that the Inholders possess valid Revised Statute 2477 easements, their claim that Forest Service permitting requirements work a compensable regulatory taking is not ripe for review. As a general rule, "the mere assertion of regulatory jurisdiction by a governmental body does not constitute a regulatory taking." *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 126 (1985) ("*Riverside Bayview*"). Importantly, moreover, "a takings claim challenging the application of land-use regulations is not ripe unless 'the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue.'" *Palazzolo*, 533 U.S. at 618 (quoting *Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 186 (1985)); *see Boise Cascade Corp. v. United States*, 296 F.3d 1339, 1351–52 (Fed. Cir. 2002). "It follows from the nature of a regulatory takings claim that an essential prerequisite to its assertion is a final and authoritative determination of the type and intensity of development legally permitted on the subject property." *MacDonald, Sommer & Frates v. Yolo Cty.*, 477 U.S. 340, 348 (1986). Simply put, a reviewing court lacks an adequate predicate to determine whether a regulatory taking has occurred unless it knows, with a reasonable degree of certainty, what strictures the government will ultimately place on a permit applicant's property. *See Riverside Bayview*, 474 U.S. at 127 ("[T]he very existence of a permit system implies that permission may be granted, leaving the landowner free to use the property as desired.").

There is no indication in the record that the Inholders have applied for a special use permit—or have otherwise sought authorization—to reconstruct Forest Roads 89 and 268. *See Federal Claims Decision*, 131 Fed. Cl. at 653 (noting that the Inholders "do not allege . . . that they

have applied for [a] special use permit or paid any fees"). Because they have not yet availed themselves of Forest Service permitting procedures, their regulatory takings claim is unripe for adjudication. *See McGuire*, 707 F.3d at 1360 (concluding that a regulatory takings claim was unripe where a landowner had not "submitted a written permit application or plans to reconstruct [a] bridge" leading to his property); *Morris*, 392 F.3d at 1375–77 (concluding that a regulatory takings claim was unripe where the landowners had not yet applied for a permit that would have allowed them to harvest redwood trees on their property); *Burlington N. R.R. Co. v. United States*, 752 F.2d 627, 630 (Fed. Cir. 1985) (concluding that any takings claim was "premature" since the property owner had not yet sought a mining permit). Although the Inholders allege that obtaining a special use permit will be prohibitively expensive, a claim based on the "novel theory that a compensable taking can arise from the cost of complying with a valid regulatory process" is premature until the final cost of compliance with permitting requirements has been determined. *Morris*, 392 F.3d at 1377. "[R]ipeness is peculiarly a question of timing." *Reg'l Rail Reorganization Act Cases*, 419 U.S. 102, 140 (1974). Until there has been a final decision on whether— and under what conditions—the Inholders will be granted permission to reconstruct Forest Roads 89 and 268, any claim for a regulatory taking remains "abstract and conjectural." *Forest Props., Inc. v. United States*, 177 F.3d 1360, 1365 (Fed. Cir. 1999); *see MacDonald*, 477 U.S. at 348 ("A court cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes.").

This is not a case in which a landowner's failure to seek a permit can be excused as futile. *See Palazzolo*, 533 U.S. at 622 (explaining that the "[r]ipeness doctrine does not require a landowner to submit applications for their own sake"); *Anaheim Gardens v. United States*, 444 F.3d

1309, 1315 (Fed. Cir. 2006) (stating that "[a] claimant can show its claim was ripe with sufficient evidence of the futility of further pursuit of a permit through the administrative process"). To the contrary, the Forest Service has specifically acknowledged that the Inholders have a right to access their inheld properties, J.A. 34, and has expressed a willingness to "continue to work with [them] to ensure that [they] continue to have adequate and reasonable access to [their] propert[ies]," J.A. 86. In this regard, the agency has suggested that the Inholders and other private landowners "collectively work together to reconstruct [Forest Roads 89 and 268]," and has stated that it will "facilitate the creation of a formal road association" and grant that association "a recordable private road easement," either over the "existing alignment . . . [or] over a new alignment." J.A. 86.

### E. The Unconstitutional Conditions Doctrine

The "well-settled doctrine of 'unconstitutional conditions,'" *Dolan*, 512 U.S. at 385, prohibits the government from "deny[ing] a benefit to a person on a basis that infringes his constitutionally protected" rights, *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 59 (2006) (citations and internal quotation marks omitted); *see Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (explaining that the unconstitutional conditions doctrine prevents a governmental body from using conditions to achieve results which it "could not command directly" (citations and internal quotation marks omitted)). In the land-use context, "a special application of this doctrine . . . protects the Fifth Amendment right to just compensation for property the government takes when owners apply for land-use permits." *Koontz*, 570 U.S. at 604 (citations and internal quotation marks omitted). In *Nollan*, for example, the Supreme Court held that a state agency could not, without paying just compensation, require the owners of beachfront property to grant a public easement over their property as a condition

for obtaining a building permit. 483 U.S. at 831–42; *see also Dolan*, 512 U.S. at 379–80, 394–95 (concluding that a taking occurred when a city required a landowner to dedicate a portion of her real property to a greenway that would include a bike and pedestrian path for public use).

Because of the typically broad powers wielded by permitting officials, landowners who seek governmental authorization to develop their properties "are especially vulnerable to the type of coercion that the unconstitutional conditions doctrine prohibits." *Koontz*, 570 U.S. at 605. "Extortionate demands" made by permitting authorities can "frustrate the Fifth Amendment right to just compensation, and the unconstitutional conditions doctrine prohibits them." *Id.*; *see Dolan*, 512 U.S. at 396.

The Inholders insist that their takings claim has ripened because the government has conditioned the grant of a permit to reconstruct Forest Roads 89 and 268 on the "surrender" of their alleged Revised Statute 2477 easements. This argument is unavailing. In a letter dated March 19, 2015, the USDA stated that it did "not agree" that the Inholders hold valid easements pursuant to Revised Statute 2477, J.A. 33, asserting that the statute did not grant easements to "private citizens," J.A. 34. In addition, although the agency urged the Inholders to continue to "work with the Forest Service to reconstruct road access," it cautioned them that "anyone using national forest lands in an unauthorized manner may be subject to criminal and civil penalties under federal law." J.A. 34.

Contrary to the Inholders' assertions, the record contains no evidence suggesting that the government has conditioned the grant of a special use permit on the relinquishment of their alleged property rights. While the government disputes that the Inholders hold valid Revised Statute 2477 easements, it has not asserted that they must cede their claim of ownership in exchange for a

permit allowing them to repair and reconstruct Forest Roads 89 and 268. To the contrary, at oral argument counsel for the government specifically stated that the Inholders would not waive any ownership rights in Revised Statute 2477 easements by availing themselves of Forest Service special use permitting procedures. *See* Oral Arg. at 14:39–15:55, http://oralarguments. cafc.uscourts.gov.mp3/2017-2224.mp3.

## F. Quiet Title Action

"[S]ince passage of the Tucker Act in 1887," parties asserting "title to land claimed by the United States" have had the right to "sue in the Court of Claims and attempt to make out a constitutional claim for just compensation." *Block v. N. Dakota ex rel. Bd. of Univ. & School Lands,* 461 U.S. 273, 280–81 (1983). In 1972, however, Congress created another procedure for adjudicating real property disputes with the government. *See id.* at 282–83. The Quiet Title Act, 28 U.S.C. § 2409a, provides a limited waiver of sovereign immunity for actions to quiet title against the United States. *See United States v. Mottaz*, 476 U.S. 834, 849 (1986) ("Prior to the passage of the Quiet Title Act, adverse claimants had resorted to the Tucker Act to circumvent the Government's immunity from quiet title suits. Rather than seeking a declaration that they owned the property at issue, such claimants would concede that the Government possessed title and then would seek compensation for the Government's having taken the property from them."). It "authorizes . . . a particular type of action, known as a quiet title suit: a suit by a plaintiff asserting a 'right, title, or interest' in real property that conflicts with a 'right, title, or interest' the United States claims." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (quoting 28 U.S.C. § 2409a(d)).

Because we conclude that the Inholders' claim alleging a Fifth Amendment taking is not ripe for adjudication,

we express no view on whether they hold valid Revised Statute 2477 easements.  We note, however, that a suit brought pursuant to the Quiet Title Act, 28 U.S.C. § 2409a, may provide an alternative mechanism for adjudication of their ownership rights in such easements.[*]

CONCLUSION

Accordingly, the judgment of the United States Court of Federal Claims is affirmed.

**AFFIRMED**

---

[*] The Quiet Title Act requires a plaintiff to "set forth with particularity the nature of the right, title, or interest which the plaintiff claims in the real property, the circumstances under which it was acquired, and the right, title, or interest claimed by the United States."  28 U.S.C. § 2409a(d).  Courts have consulted both state and federal law in determining whether valid Revised Statute 2477 property rights have vested.  *See*, *e.g.*, *Alaska Dep't of Nat. Res. v. United States*, 816 F.3d 580, 583–84 (9th Cir. 2016) ("[Revised Statute] 2477 is unusual, as land-grant statutes go, because of its self-executing nature.  No formal document memorializing the grant of a right-of-way needed to be executed by a federal official. Nor did a State, as the recipient of the grant, need to take any formal steps to accept the federal government's grant of a right-of-way.  Acceptance of a grant is determined by state law." (citations omitted)); *San Juan Cty. v. United States*, 754 F.3d 787, 791 (10th Cir. 2014) ("The question of whether a [Revised Statute] 2477 right-of-way has been accepted is a question of federal law.  However, to the extent that state law provides convenient and appropriate principles for [implementing] congressional intent, federal law borrows from it to determin[e] what is required for acceptance of a right of way." (citations and internal quotation marks omitted) (alterations in original)).